IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

MATTHEW JOSEPH HOWARD

                Plaintiff,

                                     Civil Action No.
      v.                            5:11-CV-01397 (TJM/DEP)

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____

APPEARANCES:                       OF COUNSEL:

FOR PLAINTIFF:

MCMAHON, KUBLIC & SMITH, P.C.    JENNIFER GALE SMITH, ESQ.
500 South Salina St.
Syracuse, NY 13202

FOR DEFENDANT:

HON. RICHARD HARTUNIAN       MONIKA K. PROCTOR, ESQ.
United States Attorney              Special Asst. U.S. Attorney
Northern District of New York
P.O. Box 7198
100 S. Clinton St.
Syracuse, NY 13261-7198

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

Plaintiff Matthew J. Howard, who has been diagnosed as suffering from Asperger's syndrome, has commenced this proceeding pursuant to 42 U.S.C. § 405(g) seeking judicial review of an administrative determination denying his application for supplemental security income ("SSI") benefits, based upon a finding that he is not disabled. In support of his challenge, plaintiff raises four arguments. First, he contends that the administrative law judge ("ALJ") who made the challenged determination erred in his assessment as to whether he meets or medically equals the criteria of one of the Commissioner's listed, presumptively disabling impairments. Next, plaintiff submits that the non-exertional limitations resulting from his mental impairment make it inappropriate to rely on the medical-vocational guidelines to satisfy the Commissioner's burden of proving the availability of jobs that he is capable of performing, rather than eliciting vocational testimony to address that issue. Third, plaintiff argues that the ALJ improperly rejected opinions of his treating physician that would have supported a finding of disability. Lastly, when liberally construed, plaintiff's brief appears to include an argument that the ALJ's residual functional capacity ("RFC")

determination, upon which the finding of no disability hinges, is not supported by substantial evidence.

Having carefully considered the record now before the court, in light of plaintiff's arguments, and despite having applied the requisite level of deference owed to the Commissioner's determination, I recommend that the Commissioner's determination be vacated, based upon the failure of the ALJ to explain his apparent rejection of an intelligence quotient ("IQ") test result that suggests plaintiff's condition may qualify as disabling under the Commissioner's regulations.

## I.   BACKGROUND

Plaintiff was born on March 28, 1989.  Administrative Transcript 22-23, 82, 90.[1]  At the time of the administrative hearing in this matter, held on August 9, 2010, plaintiff was twenty-one years old.  *Id.*  Howard has completed the tenth grade and, when the hearing was held, was in the process of preparing to take a General Educational Development ("GED") diploma test.  *Id.* at 23.  Although plaintiff has attempted to live independently in the past, those efforts have been unsuccessful, and he

---

[1]     Portions of the Administrative Transcript, Dkt. No. 6, which was filed by the Commissioner together with his answer, and is comprised of evidence and proceedings before the agency in this matter, will hereinafter be cited as "AT __."

currently resides with his parents.  *Id.* at 168, 204.  The plaintiff has a

driver's license, but does not possess a vehicle of his own.  *Id.* at 32.

Plaintiff has no significant past work history.  His past employment

experience is limited to having worked as a pizza deliverer, for between

three weeks and one month; as a grocery store stocker, for one month;

and as a fast food worker, for a period of one and one-half years.  AT 24-

27, 96, 104.  Plaintiff reports that during those periods, he encountered

difficulties in keeping up with his work.  *Id.* at 24-29.  Plaintiff also states

that he experienced anger and frustration in those jobs.  *Id.* at 25.

Although it is unclear precisely when the diagnosis was made,

plaintiff has been diagnosed with Asperger's syndrome.  AT 157, 159,

167, 202, 227.  In 1997, at the age of seven, he was designated as a

student with a disability classification of "other health impaired" by the

Committee on Special Education ("CSE") at the school district that he

attended.  *Id.* at 128, 131, 167.  The CSE placed plaintiff in a GED

program, but he did not succeed due to "his lack of effort and his many

absences."[2]  *Id.* at 128, 131.

At the hearing before the ALJ plaintiff's father, Joseph Howard,

_____

[2]       According to a CSE report, over the 2006-07 school year, plaintiff was
absent from school on seventy-five days, and tardy on five others.  AT 131.

testified regarding the limitations resulting from plaintiff's impairments. AT 39-44.  He reported that his son has difficulty with social interaction, communicating in a group, completing simple tasks, handling pressure, maintaining concentration, and working at a normal pace. *Id.*

Plaintiff's condition has been addressed over the years by various health professionals.  Celeste Carns, a nurse practitioner ("NP") employed at the Pulaski Medical Center, has treated plaintiff as his primary care provider since he was five years old.  AT 157.  In a report to the agency, NP Carns noted that plaintiff was always "quirky," and that she diagnosed Asperger's syndrome during his early school aged years.  *Id.*  She also reported a diagnosis of depression and mood disorder secondary to Asperger's syndrome.  *Id.* at 158.  In her report, NP Carns opined that, while plaintiff does not have any exertional limitations, his communication skills, understanding, memory, concentration, persistence, social functioning, and ability to adapt are limited.  *Id.* at 156-65.  She did not, however, provide any explanation for her findings, nor does her report quantify the extent of those limitations discussed.  *Id.*

In May of 2005, while in tenth grade, plaintiff was evaluated by Robert Griffith, Ph.D., in his capacity as the Pulaski Academy School

psychiatrist, over the course of three sessions.  AT 141, repeated at 200.

Dr. Griffith administered the Wechsler Adult Intelligence Scale, Third

Edition, (WAIS-III) IQ test and the Wechsler Individual Achievement Test,

second edition, (WIAT-II) IQ test.  *Id.* at 142.  Based upon the results of

the WAIS-III test, Dr. Griffith assigned plaintiff a verbal IQ score of 72, a

performance IQ score of 72, and a full scale IQ score of 69, and reported

very little variability in plaintiff's performance on the WIAT-II.  *Id.*  Dr.

Griffith also noted that, at the time of the examination, plaintiff was

functioning in the borderline range of general ability, and that the results of

the tests "may provide a low estimate of his actual potential . . . [but]

appear[ed] to be consistent with his day to day performance in the

classroom as reported by his teachers."  *Id.*  Based upon the results of his

evaluation and testing, Dr. Griffith recommended that plaintiff's

educational regimen be changed to a GED program with an occupational

education component.  *Id.* at 143.

Jim Maroney, M.S., C.A.S., a mental health counselor in plaintiff's

school district, treated plaintiff for one year, beginning in November 2006,

during which time he saw the plaintiff on twelve occasions.  AT 167-68.

Based upon his observations, Mr. Maroney opined that plaintiff meets

many of the hallmarks of Asperger's syndrome, including the fact that he does not like crowds, rarely initiates conversations, and is very reserved. *Id.* In his case notes, he described plaintiff's commitment to treatment, including medication and therapy, as "transitory," and opined that plaintiff's "employability [is] compromised and he [is] not capable of maintaining a residence on his own." *Id.*

Kristen Barry, Ph.D., a consultative examiner engaged by the agency, examined plaintiff in August 2009. AT 170-75. Based upon her evaluation, Dr. Barry opined that plaintiff is able to follow and understand simple instructions, and that he appears to be able to maintain his attention and concentration in a structured environment. *Id.* at 173. Dr. Barry observed that, while plaintiff maintains poor eye contact, he engages easily in conversation. *Id.* She also noted her belief that, despite a history of mild Asperger's syndrome and learning delays, plaintiff should be able to perform simple tasks independently. *Id.* Finally, Dr. Barry recommended that plaintiff continue with his psychiatric medication and suggested that he would benefit from vocational training. *Id.*

Dr. Thomas Harding, a non-examining state agency psychiatric consultant, provided a written evaluation of plaintiff's condition in

September 2009.  AT 176-99.  Based upon his review, Dr. Harding concluded that plaintiff has mild limitations in activities of daily living, and is moderately limited in maintaining social functioning, concentration, persistence, and pace.  *Id.* at 186.  Dr. Harding also found that plaintiff's impairment imposes moderate limitations on his ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, accept instructions, respond appropriately to criticism from supervisors, and set realistic goals or make plans independently of others.  *Id.* at 190-91.  Dr. Harding noted that plaintiff is able to care for himself independently, and to assist with household chores.  *Id.* at 192.  He opined that, vocationally, plaintiff would be able to follow and understand simple instructions, maintain attention and concentration in a structured environment, and perform simple tasks independently.  *Id.*

Between August 2009 and April 2010, Michele Dack, a rehabilitation counselor with Vocational and Educational Services for Individuals with Disabilities ("VESID"), counseled the plaintiff regarding employment options.  AT 203-23.  In an initial report, following the VESID referral, Ms. Dack noted the lack of information with regard to plaintiff's disability.  AT

206.  Plaintiff was asked to provide documentation concerning his diagnosis, as well as a release to allow VESID personnel to obtain his school records and medical records from Dr. Malgieri, who is listed as plaintiff's physician.[3]  *Id.*  Ultimately, Ms. Dack referred plaintiff to Thomas Griffiths, Ph.D., for an evaluation to determine his eligibility for vocational services.  *Id.* at 221.

Dr. Thomas Griffiths met with plaintiff on four occasions during May and June of 2010, and generated both a report and a medical source statement based upon his findings.  AT 224-30; repeated at AT 231-37. During that time, he administered the WAIS-III and WIAT-II tests.  *Id.*  Dr. Griffiths reported that plaintiff's general cognitive ability is in the borderline range of intellectual functioning.  *Id.* at 225.  Dr. Griffiths documented plaintiff's full scale WAIS-III IQ score of 72, with a verbal IQ score of 75, and a performance IQ score of 74.  *Id.* at 225.  He noted that the scores suggest that plaintiff's "impaired processing abilities compromise his ability to process and acquire information - especially novel or complex information - in an efficient manner."  *Id.* at 227-28.  Dr. Griffiths further reported that plaintiff "lies within the autistic spectrum disorders -

---

[3]      The record now before the court contains no medical records from Dr. Malgieri.

9

somewhere between Asperger's Disorder and Nonverbal Learning Disability." *Id.* He also noted that a diagnosis of Mathematics Disorder is warranted. *Id.* Based on these findings, Dr. Griffiths opined that plaintiff would benefit from an educational program that addressed his particular learning style and his social and emotional problems. *Id.* He added, however, that addressing plaintiff's social interaction difficulties in any educational or vocational programming should be paramount. *Id.*

In his medical source statement, Dr. Griffiths reported that plaintiff's impairments moderately limit his ability to understand and remember short, simple instructions. AT 229-30. He also reported that plaintiff has a marked limitation in his ability to carry out short, simple instructions, understand and remember detailed instructions, make judgments on simple work-related decisions, and interact appropriately with supervisors and co-workers. *Id.* Further, he opined that plaintiff has an extreme limitation in his ability to carry out detailed instructions, interact appropriately with the public and respond appropriately to work pressures and changes in a routine work setting. *Id.* at 230. He concluded by describing plaintiff as "unable to engage in competitive employment." *Id.*

## II.    PROCEDURAL HISTORY

### A.    Proceedings Before the Social Security Administration

Plaintiff applied for SSI benefits on June 9, 2009, alleging a disabling onset date of January 1, 1995.[4]   AT 82-85.  Following the denial of his claim, a hearing on the matter was conducted before ALJ Thomas P. Tielens on August 5, 2010, at which plaintiff was represented by legal counsel.  AT 19-51.  ALJ Tielens subsequently issued a written decision dated September 22, 2010, finding that plaintiff is not disabled, and therefore is ineligible to receive SSI benefits.  *Id.* at 8-18.

In his decision, the ALJ applied the familiar, five-step test for determining disability.  AT 13.  At step one, he found that plaintiff had not engaged in substantial gainful activity since his alleged onset date.  *Id.*  At step two, the ALJ found that plaintiff has two severe mental impairments, including Asperger's syndrome and low intellectual functioning.  *Id.*  He further found, however, that these mental impairments do not meet or medically equal any of the listed, presumptively disabling conditions set forth in the applicable regulations, 20 C.F.R. Pt. 404, Subpt. P, App.1.

Before proceeding to step four of the sequential analysis, the ALJ

---

[4]    Plaintiff's application sought disability insurance benefits, but it has been treated by the agency and the parties as a request for SSI payments.

then determined that, although plaintiff has the residual functioning capacity ("RFC") to perform a full range of work at all exertional levels, his mental impairments limit him to simple work in a low contact setting. *Id.* at 15. After noting at step four that the plaintiff has no prior relevant work experience, the ALJ applied Rule 204.00 of the Commissioner's medical-vocational guidelines ("grids"), 20 C.F.R. Pt. 404, App. 2, as a framework for determining disability, in reliance upon Social Security Ruling ("SSR") 85-15, concluding that considering plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that plaintiff can perform. *Id.* at 17. As a result, the ALJ found that plaintiff is not disabled. *Id.*

The ALJ's determination became final on November 10, 2011, when the Social Security Administration Appeals Council rejected plaintiff's application for review of that decision. AT 1-5.

B.    Proceedings in This Court

Plaintiff commenced this action on November 29, 2011. Dkt. No. 1. Issue was thereafter joined by the Commissioner's filing of an answer, accompanied by a transcript of the proceedings and evidence before the agency, on March 6, 2012. Dkt. Nos. 5, 6. With the filing of plaintiff's brief

on March 9, 2012, Dkt. No. 8, and that on behalf of the Commissioner on April 23, 2012, Dkt. No. 10, the matter is now ripe for determination, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(d).  *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Scope of Review

A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited; that review requires a determination of whether the correct legal standards were applied, and whether the decision is supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, his decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence.  *Martone*, 70 F. Supp. 2d at 148 (citing *Johnson*, 817 F.2d at 986).  If, however, the

correct legal standards have been applied and the ALJ's findings are supported by substantial evidence, those findings are conclusive, and the decision should withstand judicial scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact. 42 U.S.C. § 405(g); *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel*, 13 F. Supp. 2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.).

The term "substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)); *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003). To be substantial, there must be "'more than a mere scintilla'" of evidence scattered throughout the administrative record. *Richardson*, 402 U.S. at 401, 91 S. Ct. at 1427 (quoting *Consolidated Edison Co.*, 308 U.S. at 229, 59 S. Ct. 219); *Martone*, 70 F. Supp. 2d at 148 (quoting *Richardson*). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides,

because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 715 S. Ct. 456, 464 (1951)).

When a reviewing court concludes that incorrect legal standards have been applied, and/or that substantial evidence does not support the Social Security Administration's ("SSA") determination, the SSA's decision should be reversed.  42 U.S.C. § 405(g); *Martone*, 70 F. Supp. 2d at 148. In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to develop a full and fair record or to explain his or her reasoning.  *Martone*, 70 F. Supp. 2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  A remand pursuant to sentence six of section 405(g) is warranted if new, non-cumulative evidence proffered to the district court should be considered at the agency level. *Lisa v. Sec'y of Dep't of Health and Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991).  Reversal without remand, while unusual, is appropriate when there is "persuasive proof of disability" in the record and it would serve no useful purpose to remand the matter for further proceedings before the

SSA.  *Parker*, 626 F.2d at 235; *see also Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 57 (2d Cir. 1992); *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983).

B.      Disability Determination - The Five Step Evaluation Process

The Social Security Act defines "disability" to include the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).  In addition, the Act requires that a claimant's

> physical or mental impairment or impairments
> [must be] of such severity that he is not only
> unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of substantial
> gainful work which exists in the national economy,
> regardless of whether such work exists in the
> immediate area in which he lives, or whether a
> specific job vacancy exists for him, or whether he
> would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

The Commissioner has prescribed a five step evaluative process to be employed in determining whether an individual is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The first step requires a determination of

whether the claimant is engaging in substantial gainful activity; if so, then the claimant is not disabled, and the inquiry need proceed no further. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not gainfully employed, then the second step involves an examination of whether the claimant has a severe impairment or combination of impairments which significantly restricts his or her physical or mental ability to perform basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations. *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1. If so, then the claimant is "presumptively disabled." *Martone*, 70 F. Supp. 2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If it is determined that it does, then as a final matter the agency must examine whether the claimant can do any other work. *Id.* §§ 404.1520(f), 416.920(f).

The burden of showing that the claimant cannot perform past work lies with the claimant. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584. Once that burden has been met, however, it becomes incumbent upon the agency to prove that the claimant is capable of performing other work. *Perez*, 77 F.3d at 46. In deciding whether that burden has been met, the ALJ should consider the claimant's RFC, age, education, past work experience, and transferability of skills. *Ferraris*, 728 F.2d at 585; *Martone*, 70 F. Supp. 2d at 150.

C. The Evidence in This Case

In support of his challenge to the Commissioner's determination, plaintiff raises four arguments, contending that (1) the ALJ erred in his assessment as to whether he can meet or medically equal the criteria of a listed impairment, specifically citing Listings § 12.05; (2) the non-exertional limitations resulting from his mental impairment make it inappropriate to rely on the grids to satisfy the Commissioner's burden at step five of the relevant inquiry, rather than through eliciting vocational testimony; (3) in rejecting the opinions of Dr. Griffiths, the ALJ erred in failing to apply the treating physician rule; and (4) the ALJ's RFC finding unsupported by substantial evidence.

18

1.      Impairment Listing

Plaintiff argues that the ALJ erred in finding that he does not meet

the requirements of Listing § 12.05, relating to mental retardation.  That

listing provides as follows:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period: i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A.      Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>
> OR
>
> B.      A valid verbal, performance, or full scale IQ of 59 or less;
>
> OR
>
> C.      A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> OR

> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
> > 1. Marked restriction of activities of daily living; or
> >
> > 2. Marked difficulties in maintaining social functioning; or
> >
> > 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> >
> > 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

In his decision, the ALJ dismissed the applicability of Listing § 12.05(A), determining that the requirements of that subsection were not met because plaintiff is "independent in his activities of daily living and is able to follow directions to undergo intelligence testing."  AT 14.  The ALJ also found that plaintiff is unable to meet the additional requirements of Listing § 12.05(D), even if he could meet the IQ criterion.  *Id.*  He went on to conclude that plaintiff cannot meet the IQ requirements of Listings §§ 12.05(B)(C) or (D) because his "valid" IQ scores are all above 70.  *Id.* at 14.  In making that finding, the ALJ disregarded the results of IQ testing conducted by Dr. Robert Griffith in 2005, reflecting a full scale IQ score of

69, and instead placed reliance upon later testing by Dr. Thomas Griffiths in 2010, revealing verbal, performance, and full scale IQ scores, respectively, of 75, 74, and 72.  *See* AT 285.

In his decision, the ALJ failed to properly consider whether plaintiff can meet or equal the requirements of Listing § 12.05(C).  To meet that portion of the listings, plaintiff must have, in addition to "a valid verbal, performance, or full scale IQ of 60 through 70[,] . . . a physical or other mental impairment imposing an additional and significant work-related limitation or function."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C). Plaintiff maintains that he has met his burden of showing that his impairments meet the criteria of Listing 12.05(C) because, in addition to the fact that his 2005 IQ test results meet the IQ requirement, his diagnosis of Asperger's syndrome, together with the findings of Dr. Thomas Griffiths, fulfill the second requirement.

The Commissioner's regulations require that, for purposes of the listings, "IQ test results must . . . be sufficiently current for accurate assessment under 112.00."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(D)(10).  The regulations specify that IQ test results obtained between the ages of seven and sixteen are considered current for four

years when the IQ score is less than forty, and for two years when the IQ score is 40 or above. *Id.* Significantly, the regulations also instruct that "[g]enerally, the results of IQ tests tend to stabilize by the age of sixteen. Therefore, IQ test results obtained at age sixteen or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior." *Id.*

In this instance, because the 2005 testing was performed after plaintiff turned sixteen under the regulations, the test results are considered to be current. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(D)(10). Although the 2010 IQ test results reported by Dr. Thomas Griffiths, which resulted in a full scale IQ score of 72, a verbal IQ score of 75, and a performance IQ score of 74 are also considered current, the ALJ failed to explain his decision to adopt the 2010 IQ test results, rather than the 2005 IQ test results. AT 13-14.

In the event the full scale IQ scoring of 69 by Dr. Griffith from 2005 is accepted, a strong argument can be made that plaintiff meets or equals the requirements of Listing § 12.05. He has been diagnosed with Asperger's syndrome, a mental impairment. Dr. Thomas Griffiths' medical source statement supports the conclusion that the impairment imposes

additional and significant work-related limitations. Specifically, he opined

that plaintiff has moderate limitations in understanding and remembering

short, simple instructions; marked limitations for carrying out short, simple

instructions, understanding and remembering detailed instructions, and

the ability to make judgments on simple work-related decisions; and

extreme limitations for carrying out detailed instructions. AT 229. In

addition, Dr. Griffiths' medical source statement reveals his opinion that

plaintiff has extreme limitations for interacting appropriately with the

public, responding appropriately to work pressures in a usual work setting,

and responding appropriately to changes in a routine work setting; and

market limitations for interacting appropriately with supervisors and co-

workers. *Id.* at 230. Dr. Griffiths supports all of these findings with a

finding that plaintiff "suffers from Asperger's syndrome, which affects his

ability to process, understand, and respond appropriately to social

interactions." *Id.* Dr. Griffiths ultimately concludes that plaintiff is "unable

to engage in competitive employment at this time." *Id.*

In his decision the ALJ ignored the 2005 IQ test results altogether.

To be sure, those results are somewhat inconsistent with the more recent

findings of Dr. Griffiths from 2010. Courts have adopted differing views

when such conflicting IQ scores are presented. *Compare Muncy v. Apfel,* 247 F.3d 728, 733 (8th Cir.2001) (remanding "for further analysis to resolve the twenty-five point discrepancy between Muncy's two IQ scores" and directing the Commissioner to "enter specific findings detailing why Muncy's first IQ score should not be adopted as the controlling score"); *with Nieves v. Sec'y of Health & Human Servs.*, 775 F.2d 12, 14 (1st Cir.1985) (finding it improper for the Appeals Council to discredit the plaintiff's IQ scores); *see also Castillo v. Barnhart*, No. 00-CV-4343, 2002 WL 31255158, at *14 n.6 (S.D.N.Y. Oct. 8, 2002) ("However, most courts assume that a valid IQ result in the numerical range satisfies the first prong of 12.05C, and no additional inquiry is appropriate."); *Coogan v. Astrue*, No. 08-CV-1387, 2009 WL 512442, at *5 n.1, *6 n.2 (D. N.J. Feb. 27, 2009) (stating that an ALJ may not decide which of multiple IQ scores he prefers because the regulations only require one score in the range of 60 through 70); *accord, Ray v. Chater*, 934 F. Supp. 347, 350 (N.D. Cal.1996) (inferring from the regulation's preference for the lowest score amongst the verbal, performance, and full scale scores, that the regulations prefer the lowest score amongst multiple tests).

It may well be that the ALJ discounted the 2005 IQ results as being

less current, and thus less reliable, than the 2010 test results, particularly in light of the marginal nature of the full scale IQ score of 69, just barely qualifying for purposes of the first prong of Listings § 12.05(C). The ALJ may also have taken into account, in deciding to favor the 2010 results, Dr. Griffith's observations that the 2005 results could represent a "low estimate of [plaintiff's] actual potential". AT 142.[5] It was the ALJ's obligation, however, to acknowledge the 2005 IQ scores as current, pursuant to the Commissioner's regulations, and to articulate his reasons for rejecting those scores in order to provide a basis for meaningful review of his determination. The failure to do so is potentially significant. As was previously noted, it appears that, if the 2005 IQ test results control, plaintiff may well have met his burden of proving the second requirement in Listing § 12.05(C). *See Miller v. Astrue*, 07-CV-1093, 2009 WL 2568571, at *7 (N.D.N.Y. Aug. 19, 2009) (Kahn, J.) (finding that remand was unnecessary, despite the fact that the ALJ neglected to reconcile the differences between two valid and current IQ test results, because "the

---

[5] The report of Dr. Griffith's testing in 2005 notes that the test results could provide a low estimate of plaintiff's actual potential due to his level of effort and frequent inattention during the administration of the IQ test, although he also indicated that the results were consistent with plaintiff's day-to-day performance in school. AT 142.

ALJ concluded that, notwithstanding the IQ scores, Plaintiff did not meet the second prong of Listing 12.05(C)"). As plaintiff argues in his brief, several pieces of record evidence support his Asperger's syndrome diagnosis, and suggest that it causes him significant work-related limitations. AT 16-17; 173; 192.

In light of the ALJ's failure to explain his rejection of the 2005 IQ test scores, I recommend that the matter be remanded to the agency for clarification with respect to this issue and a more complete finding as to whether plaintiff's mental condition meets or equals the requirements of Listings § 12.05(C).

### 2. The ALJ's RFC Finding

Although this not wholly made clear, it appears that plaintiff also challenges the sufficiency of the ALJ's RFC finding, claiming that it is not supported by substantial evidence in the record.

In order to assess a claimant's ability to perform work existing in significant numbers in the national economy, an ALJ must determine the limits of a claimant's RFC. A claimant's RFC represents a finding of the range of tasks he is capable of performing, notwithstanding the impairments at issue. 20 C.F.R. § 404.1545(a). An RFC finding is

informed by consideration of a claimant's physical abilities, mental abilities, symptomology (including pain), and other limitations that could interfere with work activities on a regular and continuing basis.  *Id.*; *see also Martone*, 70 F. Supp. 2d at 150.

To properly ascertain a claimant's RFC, an ALJ must assess a claimant's exertional capabilities, addressing his ability to sit, stand, walk, lift, carry, push, and pull.  20 C.F.R. § 404.1569a.  In addition, an ALJ must assess a claimant's non-exertional limitations or impairments, including those that result in postural and manipulative limitations.  20 C.F.R. § 404.1569a; *see also* 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e).  When making an RFC determination, an ALJ must specify those functions which the claimant is capable of performing; conclusory statements concerning his capabilities, however, will not suffice.  *Martone*, 70 F. Supp. 2d at 150 (citing *Ferraris*, 728 F.2d at 587).  An administrative RFC finding can withstand judicial scrutiny only if there is substantial evidence in the record to support each requirement listed in the regulations.  *Martone*, 70 F. Supp. 2d at 150 (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990) (McAvoy, J.)); *Sobolewski v. Apfel*, 985 F. Supp. 300, 309-310 (E.D.N.Y. 1997).

In this instance, the ALJ concluded that, despite his medical condition, plaintiff retains the RFC "to perform a full range of work at all exertional levels."[6]  AT 15.  He also determined that, due to plaintiff's mental impairments, he is limited to "simple work in a low contact setting." *Id.*  In support of this conclusion, the ALJ explained that his finding is supported by the following record evidence: (1) Dr. Thomas Griffiths' medical report and medical assessment, to which the ALJ afforded little weight because of inconsistencies between the medical report and medical assessment; (2) Dr. Barry's consultative examination report, which the ALJ gave considerable weight because it is "more consistent with the record than Dr. Griffith[s'] assessment"; (3) NP Carns' medical report, to which the ALJ assigned little weight because "it is not from an acceptable medical source"; (4) Mr. Maroney's report, which the ALJ gave little weight because it is not a medical opinion; and (5) Dr. Harding's mental RFC assessment, to which the ALJ assigned considerable weight because "it is consistent with Dr. Barry's opinion and is well-supported by the objective evidence of record."  *Id.* at 16-17.  In addition, the ALJ found that plaintiff's "statements concerning the intensity, persistence and

---

[6]      Plaintiff does not challenge this aspect of the ALJ's RFC finding.

limiting effects of [his] symptoms are not entirely credible." *Id.* at 15.

After carefully reviewing the record evidence, I find that the ALJ's findings are supported by substantial evidence in the record. In making this determination, I am mindful that, that "substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. In addition, where the evidence is deemed susceptible of more than one rational interpretation, the Commissioner's conclusion must be upheld. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982). Here, although the ALJ appears to have minimized plaintiff's Asperger's syndrome diagnosis, and despite the fact that the ALJ neglected to consider Dr. Robert Griffith's psychological report dated May 5, 2005, there is "more than a mere scintilla of evidence" that supports the ALJ's RFC determination. For example, Dr. Barry's consultative examination report found plaintiff "able to follow and understand simple directions and instructions and appears able to maintain his attention and concentration in a structured environment." AT 173. This conclusion is supported by Dr. Barry's observations that plaintiff communicated in a clear, coherent

manner during her examination. *Id.* at 172. To the extent that plaintiff

relies on Dr. Griffiths' medical assessment in arguing that the ALJ's RFC

determination did not consider plaintiff's non-exertional limitations, that

argument is rejected. The ALJ considered, in some detail, the

inconsistencies contained between Dr. Griffiths' medical report, *id.* at 224-

28, and his medical assessment, *id.* at 229-30. *Id.* at 16. In addition,

plaintiff appears to confuse Dr. Thomas Griffiths, who examined plaintiff in

2010, with Dr. Robert Griffith, who examined plaintiff in 2005. *See* Dkt.

No. 8 at 10 n.2 (explaining that "Doctor Griffiths treated the plaintiff while

he was a student at Pulaski Free Academy" but citing Dr. Robert Griffith's

report from 2005).

For all of these reasons, I conclude that the ALJ's RFC

determination is supported by substantial record evidence.

### 3. The ALJ's Reliance Upon the Grids

Plaintiff next argues that the ALJ erred in relying upon the grids to

determine the question of disability, and in doing so, failed to consider the

impact of plaintiff's non-exertional limitations upon his ability to perform

work-related functions. He argues that, instead, the ALJ should have

elicited the testimony of a vocational expert in order to satisfy the

Commissioner's burden at step five to demonstrate that no jobs exist in significant numbers in the national economy capable of being performed by the plaintiff despite his impairments.

Ordinarily, the Commissioner can meet his burden in connection with the fifth step of the relevant disability test by utilizing the grids, 20 C.F.R. Pt. 404, Sbpt. P, App. 2. *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999); *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986). The grids take into consideration a claimant's RFC, as well as his age, education and work experience, in order to determine whether he can engage in substantial gainful work in the national economy. *Rosa*, 168 F.3d at 78. If a claimant's situation fits well within a particular classification, then resort to the grids is appropriate. *Id.* If, on the other hand, a claimant's non-exertional impairments significantly limit the range of work permitted by exertional limitations, then sole reliance on the grids is inappropriate, and further evidence and/or testimony is required.[7] *See Rosa*, 168 F.3d at 78

---

[7] An "exertional limitation" is a limitation or restriction imposed by impairments and related symptoms, that affect only a claimant's ability to meet the strength demands of jobs (i.e. sitting, standing, walking, lifting, carrying, pushing, and pulling). 20 C.F.R. §§ 404.1569a(b), 416.969a(b); *see also Rodriguez v. Apfel*, No. 96-CV-8330, 1998 WL 150981, at *10 n.12 (S.D.N.Y. Mar. 31, 1998). A "non-exertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c). Examples of

("[S]ole reliance on the Grids may be precluded where the claimant's exertional impairments are compounded by significant nonexertional impairments that limit the range of sedentary work that the claimant can perform." (internal quotation marks and alterations omitted)); *Bapp*, 802 F.2d at 605-06 ("[W]here the claimant's work capacity is significantly diminished beyond that caused by his exertional impairment[,] the application of the grids is inappropriate.").

It is true that "[i]f a claimant's RFC consists of only nonexertional limitations, the Grids may not be used to determine disability." *Vanbuskirk v. Astrue*, No. 07-CV-0525, 2009 WL 4067646, at *10 (W.D.N.Y. Nov. 20, 2009) (citing 20 C.F.R. § 404.1569a(c)(2) ("If your impairment(s) . . . only affect your ability to perform the nonexertional aspects of work-related activities, the rules in appendix 2 do not direct factual conclusions of disabled or not disabled.")). In recognition of this principle, the ALJ appropriately noted that the application of the grids could not be relied upon directly to determine the question of disability. AT 17-18. He did, however, utilize the grids as a framework to assist him in determining the

————————————

non-exertional limitations are difficulties with sight or vision, difficulties tolerating dust or fumes, difficulties performing manipulative or postural functions (i.e., reaching, handling, stooping, climbing, crawling, or crouching). 20 C.F.R. §§ 404.1569a(c)(1)(iv), (v), (vi), 416.969a(c)(1)(iv), (v), (vi); *see also Rodriguez*, 1998 WL 150981, at *10 n.12.

issue.  *Id.*

The regulation governing the use of the grids in situations where only non-exertional limitations are presented provides that the "determination as to whether disability exists shall be based on the principles in the appropriate sections of the regulations, giving consideration for the rules for specific case situations in this appendix 2." 20 C.F.R. Pt. 404, Supbt. P, App. 2, § 200.00(e)(1); *see also* 20 C.F.R. § 404.569a(c)(2).  As SSR 85-15 clarifies, "[w]here there is no exertional impairment, unskilled jobs at all levels of exertion constitute the potential occupational base for persons who can meet the mental demands of unskilled work."  SSR 85-15 at 4.  That ruling notes that "[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, co-workers, and usual work situations; and to deal with changes in a routine work setting."  *Id.*  It is only upon a showing of a substantial loss in the ability to meet any of these basic work-related activities that a finding could be made of a severe erosion, caused by a mental non-exertional limitation, of the potential occupational base upon which the grids are predicated.  *Id.*

In this instance, the plaintiff's RFC, as determined by the ALJ, is consistent with his ability to meet the mental demands of unskilled work, as set forth in SSR 85-15. The ALJ specifically found that plaintiff can understand, remember, and carry out simple instructions; is able to respond appropriately to supervision, co-workers and usual work situations; and can deal with changes in a routine work setting. AT 15. The additional requirement that the plaintiff be placed in a "low-contact setting" does not significantly diminish the occupational base of unskilled work because such jobs ordinarily involve dealing primarily with objects rather than people. SSR 85-15 at 4.

Because the occupational base associated with unskilled work was not significantly diminished as a result of plaintiff's non-exertional limitations, the ALJ properly relied upon the grids as a framework for determining disability.

### 4. Treating Physician Rule

Plaintiff also challenges the ALJ's rejection of opinions rendered by Dr. Thomas Griffiths, arguing that, in doing so, the ALJ failed to give proper deference to those opinions in accordance with the treating physician rule.

"With respect to the nature and severity of [a claimant's] impairment(s), the SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotations and alterations in original, citations omitted). "According to this rule, the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" *Burgess*, 537 at 128 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Veino,* 312 F.3d at 588.

Here, the record does not support a finding that Dr. Thomas Griffiths is, or was at any time, plaintiff's treating physician.  Rather, plaintiff was referred to Dr. Griffiths for a "neuropsychological evaluation by his VESID counselor[.]"  AT 224.  Although Dr. Griffiths saw plaintiff on four separate occasions over a one-month period of time for purposes of that evaluation, there is no indication that he was retained for the purpose of providing mental health treatment for the plaintiff.  Accordingly, Dr. Griffiths does not qualify under the Commissioner's regulations as a treating source, and

the ALJ did not err in failing to apply the treating physician rule to Dr. Thomas Griffiths' opinions.[8] 20 C.F.R. § 404.1527(c); *Schisler v. Sullivan*, 3 F.3d 563, 569 (2d Cir. 1993) (defining a treating source as a plaintiff's "own physician, osteopath, or psychologist . . . who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual").

## IV.    SUMMARY AND RECOMMENDATION

The ALJ's decision in this case properly discounts opinions of Dr. Thomas Griffiths, who is not properly regarded as plaintiff's treating source; includes an RFC finding that is supported by substantial evidence; and appropriately concluded non-disability at step five of the controlling, sequential analysis, utilizing the grids as a framework and taking into account the non-exertional limitations stemming from plaintiff's mental impairment.  The ALJ's decision is fatally flawed, however, in that it does not provide an explanation of why plaintiff does not meet or medically equal a listed impairment based upon the valid IQ score of less than 70, in

---

[8]       As was previously noted, it appears that plaintiff has confused Dr. Thomas Griffiths, who examined him in 2010 at the request of VESID personnel, with Dr. Robert Griffith, who examined him in 2005 in connection with his education at Pulaski Free Academy.  *Compare* AT 200-201 (Dr. Robert Griffith's Medical Report) *with* AT 224-28 (Dr. Thomas Griffths' Neuropsychological Report).

combination with a diagnosed condition of Asperger's syndrome and significant evidence that the condition can affect his ability to perform work functions.  Accordingly, I recommend that the matter be remanded to the agency for clarification as to why plaintiff does not meet or equal that listed impairment.[9]

It is therefore hereby respectfully

RECOMMENDED that plaintiff's motion for judgment on the pleadings be GRANTED, the Commissioner's determination of no disabilty VACATED, and the matter be REMANDED for further proceedings consistent with this report.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.

---

[9]     Although plaintiff seeks remand solely for the calculation of benefits, such a course of action is not appropriate in this case.  As was noted earlier, reversal and remand for the calculation of benefits is warranted only "when there is 'persuasive proof of disability' [in the record] and further development of the record would not serve any purpose."  *Steficek v. Barnhart*, 462 F. Supp. 2d 415, 418 (W.D.N.Y. 2006) (quoting *Rosa*, 168 F.3d at 83).  Remand for further consideration, on the other hand, is justified when the ALJ has applied an improper legal standard, or further findings and explanations would clarify the ALJ's decision.  *See Rosa,* 168 F.3d at 82-83; *Parker,* 626 F.2d at 235; *Steficek*, 462 F. Supp. 2d at 418 (citing *Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir. 1996)).  In this instance, remand is required for the purpose of making further findings and offering additional explanations of the evidence, and not because there is persuasive proof of disability in the existing record.

FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d),

72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this

court's local rules.

Dated:      January 22, 2013
            Syracuse, New York

David E. Peebles
U.S. Magistrate Judge